Mr. Aguilar, in this measure, I'd like to reserve two minutes for a public question. Pursuant to this Court's order, I will focus today's argument on Mr. Aguilar's motion to remand. However, for preservation purposes, I will have to be clear. Mr. Aguilar is pursuing a public issue since his briefing, including a mother-of-the-born error. I would correct Mr. Aguilar by focusing our argument here on saying that anybody waived his leave, so we don't need to... Good. Could you explain some of the impact? Thank you, Your Honor. In terms of Mr. Aguilar's motion to remand, I'd like to focus this Court's attention to two areas the Court may have failed. First, the Court erred in failing to provide a reasonable explanation for its decision. And second, if we get past that conditional obstacle, the Court cannot follow this Court's precedent to material evasion. Regarding the first aspect of providing a reasonable explanation, if this Court looks to the record on page 5, the Court supports its decision with two paragraphs. But if you read those two paragraphs, the Court cites one decision from this Court. It's an asylum case from 1992, and it's been expressly overruled by this Court. It gives no description of any of the presumed possibly dispositive evidence. In this Court's decision, Aguilar, Ramos, Coonerty, reports are possible. Let me just move on to exactly what's bothering me in the case. I guess you don't have a lot of time. I looked at an entire package of material that's been involved. It's not entirely used in pages or stuff. And I didn't see much in there that was supportive of your client's position, but there was a vertical from a magazine in 2002 that described five former gang members who were murdered at the Congress Church in El Salvador. But by the time this motion's reopen occurred, much more than a decade had passed, and the remaining evidence shows things like the 2012 truce and many other changes that don't support necessarily a reasonable inference that what happened in 1999 to 2002 is still true in 2015. So I guess I had some difficulty seeing why it would be an abuse of discretion to say that there wasn't enough evidence to demonstrate that he would be subject to something different than other people in his home country, that his conditions generally aren't turbulent, I think is the word they used, but he hadn't demonstrated any individual change. What's wrong with your reasoning given the evidence that you submitted? You should have looked at pages and two parts of the first part if you looked at the evidence submitted. The 2013 State Department report says, and I'm quoting, can there be torture and murder of rival gang members is extremely common. That's right. Now, rival gang members, but there's also something that's not government doing it or the fact that I think there was something in front of it that said there were no government killings in a recent period of time. And so the fact that there are rival gangs going on, I'm not sure where that gets to. Your Honor, again, I would like to highlight the fact that the board didn't mention any of this. We're sort of supposing what the board might have done. The board said they read all the material and they made a conclusion about it, and I guess I'm not sure they had to go through an explanation about it for each page you could put. I completely agree with you, Judge Gerber. We don't want an exegesis for each one of these pieces of evidence. What's your strongest evidence that's dated later, from 2002, that there's either government activity or government acquiescence in the things that would be targeting this individual or individual? Yes, Your Honor, I'm going to show you two record pages, page 9, 105, and 106, and 121. And just briefly, the United States Department of Defense spoke about the tendency towards the murder of rival gang members. The reason that it's important is to renege on what would be perceived to be a gang member he was visited to. No one's going to stop and ask him, or much less believe him, if he sees he's no longer there. Second, in record pages 105 and 106, is the Congressional Research and Service Report, and I'm quoting, the State Department has reported that Salvadoran military and police have been accused of involvement in unlawful police and torture. It proceeds, there will be a challenge for SARIN, which is the new regime that came in in November of 2014, to ensure the security of officials, both police and military, to not engage in human rights abuses and carry out law enforcement functions now that they've been given the legal authority to shoot back in cases of gang attack. And that's, again, generic to everybody, right? It is, Your Honor. There's nothing in the state reports that talk about disturbing a lawyer. Well, no, I don't mean the new regime specifically, but to say people returning from the United States are going to be perceived to be lawyers. Yes. I mean, that's an order written in. What's it, page 121? Page 121 is a newspaper about Operation Seathouse. President SARIN has given these, they're called dead spots, these sort of paramilitary groups that are operating, at least in our opinion under the United States, if not the approval of the government, to go through various sections of towns and raid houses at night looking for gang tattoos. That newspaper sets forth what these paramilitary groups are doing. They're lifting men's shirts looking for tattoos. As soon as the person is tattooed, they're at rest unless they're detained and forced to kill. I see the new government policy, as I understood it, to target gangs much more severely than had been previously the case. Yes, as the federal government has said, it's a green light to go after gang members. The previous regime from 2009 to 2014, they did engage in the truce that you mentioned. It was basically looked at as a way for the government to work together because some people described the gangs as sort of a shadow government. 2014 comes along with President SARIN. He takes the opposite approach. He shoots down and doesn't ask him off. And that is the stated policy. The vice president is on the record saying that they will shoot and not have him in any other movies, any issues whatsoever, if they use deadly force. So Mr. Aguilar will, when he gets removed, if he's removed and he still has a tattoo, he will be able to see it as a gang member. There's nothing. They're also going to sue and ask him whether he's an activist. If they did, I'm sure Judge Marcellino said it all the time in the district court, lots of people will say that they're no longer affiliated when it becomes convenient for them. Mr. Aguilar will be the same as most every other person walking this street with a gang tattoo, and no one's going to stop and find out whether he is or is not a former, whether he has or has not done anything wrong. Is there any response that you should have done for him to have the tattoo removed? He's been sitting in detention for six years now. If you read his affidavit, which was submitted with a motion to remove him, he talks about he will not be aware of any way that ICE would give him the possibility for tattoo removal. He doesn't have the resources for tattoo removal. And if you look to this case, this court's decision called 629-F3762, there's actually a footnote from this court saying that even if tattoo removal was possible, it's an open question as to whether or not the bail would have any bearing on him. I see that I've only got two minutes left. Would you like to respond? Well, it might have factual bearing on whether he would in fact face probable splatter in charge. Yes. I guess that's Judge Noonan's concurrency in the court. It's exactly that. If there is a way for the federal government to facilitate a tattoo removal, Judge Noonan said he would have voted for the removal. However, because there's no current scheme in the federal government system, especially for a proceeded detainee, the individual motion serves as a renegotiation of his detention. Judge Noonan voted to actually grant the proceedings to the agency. The floor is yours, Judge. Thank you. Thank you. Good morning. I'm pleased to report that Judge Noonan is under government. In this case, the petitioner, you should be happy because the board probably answers to this question. You did not have a motion to remain. First and foremost, although their analysis is brief, I'm reported to have voted to do so, when there is no appropriate evidence for the board to consider. Here, the most relevant evidence, I'd like to say, would be that you might find King's Travis Report, in which they do talk about former gang members being harmed by the police. That's at pages 250 to 254. But it's important to note that in saying that former gang members are harmed, it points out that they're harmed because they have the same age and appearance as current gang members. And throughout the petitioner's evidence, it stresses that gang membership seems to be at least fundamental. Pages 253, 264, and 217, the average age is between 12 and 24. So it's not clear why a petitioner who is approximately 40 would be perceived as former gang members, if he would be perceived as that or somebody that the police would want to target. In most regards to the tattoos, the record is replete with men describing being harassed by the police because of their having had tattoos in other markings. And while that's unfortunate, none of those men were harmed. In pages 46, 70, HB 73, HB 74, the men are upset, understandably, but no one was harmed. Otherwise, the record in general just shows, unfortunately, the people in El Salvador are subject to violence from the gang. There is a new government policy of targeting gang members once they end shooting. Isn't there? There's evidence in the record of that that the board did not discuss. I believe it's in page 205, 206 of that record. They're talking about shooting back at active gang members, people who are involved in criminal activity. The petitioner does not anticipate being involved in criminal activity or associated with gang members, active gang members. He's at no risk of harm. Except that there's also evidence in the record of people going around looking for gang tattoos to go after people. Somehow you're saying that he's too old for that, but it seems like he does have that tattoo, and it seems like that makes him different than all of his countrymen. And the agency said there's no difference between him and any of his other countrymen, which just seems blatantly false. Thank you, Your Honor. The evidence that we're stopping is on account of having a tattoo. We specifically stopped them because they had a tattoo. None of them spoke about being harmed, physically harmed. And what years were those? Were those after the policy where they're now targeting gang members on site? I'm not sure which years. I'm going to have to go back and look at those documents, Your Honor. Because if you put together that they're looking for tattoos with the new policy of targeting gang members, it seems like there is a change in the statute. Sure, but it should also be noted that in his administrative appeal, in his remand proceedings, the petitioner in this case said that the police target and kill people for extrajudicial killings. So it was going on before this most recent policy. Well, I have a question about this issue of removal of the tattoo, because we've been informed that the police are looking for a recent tattoo. I mean, that's really due to personal blame, and whatever danger is associated with it would be communally related. What is the government's policy or practice about assisting former gang members to get those tattoos removed? Counsel is unsure, but the petitioner's counsel in this case has never approached the Department of Justice requesting that we contact the Homeland Security about their adoption. Well, I'm from the Central District, and I know in our district there's been a fairly active program to aid those who want tattoos removed. And so it's something that certainly could be done. There are organizations who are doing it with limited fee, or maybe no fee in some cases, so it's something that should be explored. But the government has no knowledge as to how that could have been done. Again, if we had been asked, we would have been happy to approach the Homeland Security about the adoption. And as we pointed out in a respondent's answering brief, there are multiple services in El Salvador that also provide this service to former gang members. But isn't his claim that as soon as he gets back, he's going to be targeted, he wouldn't have time to go to some service once he's back? But the article is on the record, Your Honor, that former gang members do not have time to talk about being harmed. It's all about them going to the tattoo removal services in an effort to progress with their lives. He has said that he has them. He doesn't have the ability to get his tattoo removed here. Isn't that correct? If that's what you'd like to speak in, Your Honor, we would be happy to. I think he said that. Well, we'll have to hear from counsel on that. But he certainly said he doesn't have the financial resources to pay for it, but absolutely, really, the complete answer is there are volunteers, as it sounds from Judge Marshall, that there are that are willing to do this for no cost. The agency seems to have thought that he could have gotten his tattoo removed here, but there's no evidence in the record to support that, is there? Well, that was what provides to the social reporting, Your Honor. Right, but part of that, I know we're not discussing it, but in that discussion, the agency seems to have thought that he could get his tattoo removed, but I didn't see any support for that. I mean, Judge Marshall has said that it exists in some places, but there's no evidence that it exists where he is or that they've ever offered it or anything, is there? No, he didn't say he'd request an opportunity to do so. Well, I'm not sure if that goes both ways. I mean, he did say that it could be offered or requested. I'm not sure whether that matters. I don't have any other questions. All right. I'm going to leave the stage open. If you have any questions, please do. So I guess the first question that all of us want to have you respond to is to what extent have you tried to find services that may remove the tattoo without saying you're an employee? Yes, so first I would point the panel to Record Page 39, it's paragraph 22 of Mr. Aguilar's affidavit. He talks about his inability to find anyone that would do this for him, and Eloy, I would remind the panel, he's been detained for six years. He didn't have counsel for four and a half of those years. So he was operating in the dark for almost all of his life. Now he has counsel. Is there any impediment to finding one of these services to remove his tattoo? So this is not part of the record. I do know that there have been efforts made by counsel to find a tattoo removal program. There apparently is a possibility in Aaron here, Eloy, of a doctor that does this type of thing. However, it's not clear what the cost would be. And obviously here in Las Vegas, this is something that will have to be done for bono by the doctor, which at this point I'm not aware of how that would work out. But even if we assume, Judge, you're going to register an argument saying that he could get it removed, I would point the panel to the Cool Decision in section 39 of 38786. It's an argument. It talks about that even if some of these dentists are able to get a tattoo removal, they do him just as far in his goal. It gives the same appearance to a lot of the folks So it's just a piece of pencil and paper. And obviously what he's still going to have, that gigantic, as it's called, pack, is covered with a tattoo. So it's not as if this is just a very simple, once you have the tattoo removal, everything is going to be okay. And the Cool Decision makes that very clear. The last thing I'd like to point to, my timer didn't start, but I assume I'm getting close in time, is if you get to the Androne case, the Androne case actually describes what the holding of coal is. And one of coal's holdings is that if you were looking at someone with gang-affiliated tattoos, and they were going to be facing removal to a country known for torturing gang members, the board has to actually assess that. They have to analyze that. Here the board didn't analyze anything, much less the analyzing was required to be done by coal, as interpreted by this court in Androne. So we're not looking at a situation where the board made some sort of finding or disagreed with it. We're seeing the board actually didn't fall into this court's own precedent, given the circumstances of Mr. Eggler. So when you combine the fact that the board didn't look to the country condition reports, the board didn't look to the real-life danger Mr. Eggler faces, like the court here, this is Mr. Eggler facing a danger, the board never sees him in danger, the government never sees him in danger, Mr. Eggler's in danger, just a little, but how much? So if we're looking at this, the board didn't do any of the things that this court is required to do in the coal, in the Androne, and in the Aguilar-Ramos-Saleh-Brisdy. So for those reasons, that's a separate basis for this court to reverse, just to understand what the board's actually trying to do. So for those reasons, we would ask that this court just reverse the board's holding and remain Mr. Eggler's. In case we can reopen, if we can reexamine the change-of-country conditions that exist now and see what the board does with all the things we discussed today. Thank you, counsel. That case just started, you just submitted it, and we very much appreciate the helpful arguments from both of you. Now, I'll let your time end, but if your time ended for you, please return to your seats. Thank you.
judges: Graber, Friedland, Marshall